**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ERIKA BASTON, on behalf of herself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>MONROE UNIVERSITY, LTD.,<br><br>Defendant. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Erika Baston ("Plaintiff"), through her attorneys, individually and on behalf of all others similarly situated, brings this Class Action Complaint against Defendant Monroe University, LTD. ("Monroe" or "Defendant"), and its present, former, or future direct and indirect parent companies, subsidiaries, affiliates, agents, and/or other related entities. Plaintiff alleges the following on information and belief—except as to her own actions, counsel's investigations, and facts of public record.

## INTRODUCTION

1. This class action arises from Defendant's failure to protect highly sensitive personal and medical data entrusted to it by its students and employees.

2. Defendant Monroe University is a private, for-profit university headquartered in New York, with campuses in the Bronx and New Rochelle, New York, an international campus in Saint Lucia, and degree programs offered through Monroe Online.[1]

[1] *Home Page*, MONROE UNIVERSITY, https://www.monroeu.edu/ (last visited Jan. 20, 2026).

3. In the ordinary course of its operations, Defendant collects, stores, and maintains a vast amount of highly sensitive personally identifiable information ("PII") and protected health information ("PHI")—together, "PII/PHI"—belonging to its students and employees.

4. Defendant lost control of that information when cybercriminals infiltrated its inadequately secured computer systems in a data breach (the "Data Breach"), exposing the Class's PII/PHI to unauthorized access and misuse.

5. It is unknown precisely how long the cybercriminals had access to Defendant's network before the intrusion was discovered. What is clear is that Defendant lacked effective safeguards to prevent, timely detect, or promptly contain the breach, allowing unauthorized actors unfettered access to students' and employees' sensitive information.

6. On information and belief, the Data Breach occurred because Defendant failed to implement reasonable cybersecurity measures, failed to adequately train its employees on data security, and failed to maintain appropriate safeguards and protocols to protect the Class's PII/PHI. Defendant's omissions left that information vulnerable and made the Class easy targets for cybercriminals.

7. Plaintiff is a victim of the Data Breach and received notice from Defendant that her PII/PHI was compromised. A copy of the notice is attached as Exhibit A. Plaintiff brings this action on behalf of herself and all others similarly harmed by Defendant's misconduct.

8. he exposure of PII/PHI to cybercriminals is a harm that cannot be undone. Before the Data Breach, students' and employees' personal information was private; now, it has been exposed and remains at continuing risk of misuse.

## PARTIES

9. Plaintiff, Erika Baston, is a natural person and a citizen of New Rochelle, New York where she intends to remain.

10. Defendant, Monroe University, LTD., is a limited company organized in New York and with its principal place of business at 2501 Jerome Avenue, Bronx, New York, 10468.

## JURISDICTION AND VENUE

11. This Court has subject-matter jurisdiction over this action pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d)(2), because the proposed Class consists of more than 100 members, the aggregate amount in controversy exceeds $5 million, exclusive of interest and costs, and at least one member of the proposed Class is a citizen of a state different from Defendant.

12. This Court has personal jurisdiction over Defendant because Defendant is headquartered in New York, conducts substantial and continuous business in New York, and has sufficient minimum contacts with this forum such that the exercise of jurisdiction is proper and comports with due process.

13. Venue is proper in this District under 28 U.S.C. § 1391 because Defendant maintains its principal place of business in this District and because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

## FACTUAL ALLEGATIONS

***Defendant Collected and Maintained Highly Sensitive PII/PHI Belonging to Plaintiff and the Class***

14. Defendant is a private, for-profit university based in New York, with campuses in the Bronx and New Rochelle, New York, an international campus in Saint Lucia, and degree programs offered through Monroe Online.[2]

15. In the ordinary course of its operations, Defendant collects, receives, and maintains the highly sensitive PII/PHI of thousands of its students and employees.

16. By collecting and retaining this PII/PHI, Defendant expressly and impliedly represented that it would safeguard the information in accordance with its internal policies and applicable state and federal law. Plaintiff and Class Members, for their part, took reasonable steps to protect their own PII/PHI and reasonably relied on Defendant to do the same.

17. Under applicable state and federal law, businesses such as Defendant have a duty to protect the PII/PHI of their students and employees and to provide timely notice when that information is compromised in a data breach.

18. Defendant expressly acknowledged these duties in its publicly available Privacy Policy, in which it represented to students and employees that it takes the protection of personal information seriously. Specifically, Defendant assured users that "Your privacy is very important to us," that Monroe "is committed to protecting your online privacy," and that it "has security measures in place to protect against the misuse, alteration or loss of information." Defendant

[2] Under the Class Action Fairness Act, "an unincorporated association shall be deemed to be a citizen of the State where it has its principal place of business and the State under whose laws it is organized." 28 U.S.C. § 1332(d)(10).

further represented that it is "strongly committed to protecting personal information collected … against unauthorized access, use, or disclosure."[3]

***The Data Breach***

19. Between December 9, 2024, and December 23, 2024, Defendant was hacked in the Data Breach.[4]

20. Defendant has acknowledged that "an unauthorized party gained access to certain Monroe University computer systems and acquired copies of some files on our network during that time."[5]

21. As a result of the Data Breach, cybercriminals obtained access to a broad range of highly sensitive PII/PHI belonging to Plaintiff and the Class. The compromised information includes, among other things, individuals' names and dates of birth; Social Security numbers; driver's license, passport, and other government-issued identification numbers; medical and health-insurance information; electronic account credentials and passwords; financial account information; and student-related records.[6]

22. The precise number of individuals injured by the Data Breach is not yet known. However, upon information and belief, the size of the putative class is readily ascertainable from records maintained by Defendant and within its custody and control. Upon information and belief, the putative class consists of well over one hundred individuals and includes Defendant's current and former students and employees.

---

[3] *Privacy Policy*, Monroe University, https://www.monroeu.edu/right-know/it-department-privacy-policy (last visited Jan. 21, 2026)
[4] *See* Exhibit A.
[5] *Id*.
[6] *Notice of Data Security Incident*, MONROE UNIVERSITY, https://www.monroeu.edu/sites/default/files/documents/2026/01/07/DataSecurityIncident.pdf (last visited Jan. 19, 2026)

23. Despite the scope and sensitivity of the Data Breach, Defendant did not begin notifying affected individuals until January 2, 2026—more than thirteen months after the breach first began.

24. As a result, Defendant kept Plaintiff and the Class in the dark, depriving them of the opportunity to take timely steps to mitigate the harm caused by the Data Breach.

25. When Defendant eventually notified Plaintiff and the Class of the Data Breach, it expressly acknowledged that the incident created an ongoing and significant risk of identity theft and fraud. Defendant warned affected individuals to remain vigilant, including by closely monitoring their credit reports and financial account statements for suspicious activity."[7]

26. Defendant breached its duties by failing to implement reasonable data-security measures, which directly resulted in the Data Breach. Defendant's negligence is demonstrated by its failure to prevent unauthorized access to its systems and to protect Plaintiff's and the Class's PII/PHI, causing widespread harm and monetary losses.

27. Following the Data Breach, Defendant stated that it "is taking steps to reduce the risk of this type of incident occurring in the future."[8]

28. Such general assurances, however, are insufficient to ensure that Plaintiff's and the Class's PII/PHI will be protected from further exposure in the event of a future data breach.

29. Moreover, Defendant's own breach notice demonstrates that it cannot—or has not—determined the full scope of the Data Breach, including precisely what information was accessed or when it was exfiltrated.

30. Defendant has taken minimal steps to remedy the Data Breach. Although Defendant has offered certain affected individuals credit monitoring and identity-protection services, those

---

[7] *Id.*
[8] *Id.*

measures are insufficient to compensate Plaintiff and the Class for the injuries caused by Defendant's misconduct.

31. As a result of the Data Breach, Plaintiff's and the Class's sensitive PII/PHI was exposed to unauthorized access by cybercriminals, causing concrete injuries and significant damages.

32. 32. This Data Breach did not occur in isolation. Defendant's systems were previously compromised in a ransomware attack in July 2019, underscoring a continuing failure to maintain reasonable data-security practices.[9]

33. During the July 2019 ransomware attack, Defendant's files were encrypted, and the attackers demanded a ransom of approximately $2 million in Bitcoin."[10]

34. The July 2019 ransomware attack impacted each of Monroe's campuses in Manhattan, New Rochelle, and St. Lucia and compromised the school's website and email systems.[11]

***Plaintiff's Experiences***

35. Plaintiff Erika Baston is a current graduate student at Monroe University and was a victim of the Data Breach alleged herein.

36. In connection with Plaintiff's enrollment and continued attendance as a graduate student, Defendant obtained, collected, and maintained Plaintiff's PII and PHI.

37. As a direct and proximate result of Defendant's failure to adequately safeguard that information, Plaintiff was injured by the Data Breach.

---

[9] *See* Dark Reading Staff, *Monroe College Hit with Ransomware Attack*, Dark Reading (July 12, 2019) (describing a ransomware attack on Monroe College that demanded payment of approximately $2 million in Bitcoin).
[10] *Id.*
[11] *Id.*

38. Plaintiff is careful about the privacy and security of her PII/PHI. She does not knowingly transmit sensitive personal information over the internet in an unsafe manner and takes reasonable steps to store documents containing her PII/PHI in secure locations.

39. As a condition of receiving educational services from Monroe University, Plaintiff was required to provide Defendant with her PII/PHI. Defendant used this information to facilitate Plaintiff's enrollment and academic participation and required its disclosure as a prerequisite to enrollment.

40. Plaintiff entrusted her PII/PHI to Defendant with the reasonable expectation that Defendant would use appropriate and reasonable measures to protect it, consistent with Defendant's representations, internal policies, and applicable state and federal law. Defendant obtained and continues to maintain Plaintiff's PII/PHI and has an ongoing legal duty to protect it from unauthorized access and disclosure.

41. Plaintiff reasonably understood that a portion of the tuition and fees paid to Defendant would be used to implement and maintain adequate data security measures to protect students' PII/PHI.

42. Prior to the incident at issue, Plaintiff does not recall ever being notified that her PII/PHI had been compromised in any data breach.

43. On or about January 2, 2026, Plaintiff received written notice from Defendant informing her that her PII/PHI had been compromised in the Data Breach.

44. As a result of the Data Breach, Plaintiff's PII/PHI has been exposed to unauthorized third parties and, upon information and belief, has been disseminated—or is at imminent risk of dissemination—among cybercriminals, including on illicit online marketplaces and forums commonly referred to as the Dark Web.

45. Through its inadequate data security practices, Defendant compromised Plaintiff's PII/PHI and exposed it to theft, misuse, and unauthorized disclosure.

46. Plaintiff has spent—and will continue to spend—significant time and effort monitoring her financial accounts and personal information to protect herself from identity theft and fraud, steps that Defendant itself recommended in its breach notification.

47. Following the Data Breach, Plaintiff experienced an increase in spam and scam emails, text messages, and phone calls, consistent with the misuse of compromised personal information.

48. Plaintiff reasonably fears for her financial security and personal privacy and remains concerned about the nature and scope of the information exposed in the Data Breach.

49. As a result of Defendant's conduct, Plaintiff has suffered increased anxiety, stress, fear, and frustration—injuries that are concrete, ongoing, and far more than mere annoyance or speculative concern.

50. Plaintiff suffered actual injury from the exposure and theft of her PII/PHI, including the invasion of her legally protected privacy interests.

51. Plaintiff also suffered actual injury in the form of the diminution in value of her PII/PHI. PII/PHI is a form of valuable intangible property that Defendant was required to adequately protect.

52. Plaintiff faces a continuing and substantial risk of identity theft, fraud, and misuse of her PII/PHI because Defendant's Data Breach placed that information directly into the hands of criminals.

53. To mitigate these harms, Plaintiff anticipates spending considerable time and money on credit monitoring, identity-theft prevention, and other protective measures.

54. Plaintiff has a continuing interest in ensuring that her PII/PHI—which, upon information and belief, remains stored in Defendant's systems and backups—is properly safeguarded against future breaches.

***Defendant's Conduct Caused Common Injuries to Plaintiff and the Class***

55. As a direct result of Defendant's failure to prevent the Data Breach, Plaintiff and the Class have suffered concrete and ongoing injuries. Those injuries include monetary loss, out-of-pocket mitigation expenses, lost time, and emotional distress associated with the exposure and misuse of their sensitive PII/PHI. Plaintiff and the Class have also lost the ability to control how their personal and medical information is used, experienced a diminution in the value of that information, and face a continuing risk of identity theft, fraud, and misuse.

56. In responding to the Data Breach, Plaintiff and Class Members have incurred costs and expended significant time attempting to prevent, detect, and remediate identity theft and fraud, including monitoring accounts and credit reports, placing fraud alerts or freezes, and addressing unauthorized activity. Many have also suffered consequential harms, including delayed tax refunds, unauthorized use of their PII/PHI, and lost wages or opportunity costs from time spent addressing the fallout of the breach.

57. These injuries are ongoing. Plaintiff's and the Class's PII/PHI remains at risk so long as Defendant retains the data and continues to fail to implement adequate safeguards, exposing Plaintiff and the Class to the threat of future data breaches and further harm.

***Plaintiff and the Class Face a Substantially Increased Risk of Identity Theft and Fraud***

58. As a result of the Data Breach, Plaintiff and the Class face a heightened and ongoing risk of identity theft and fraud that will persist for years.

59. The Federal Trade Commission defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." 17 C.F.R. § 248.201 (2013).

60. The Federal Trade Commission defines "identifying information" as any name or number that may be used, alone or in combination with other information, to identify a specific individual. This includes, among other things, a person's name, Social Security number, date of birth, driver's license or other government-issued identification number, alien registration number, passport number, and employer or taxpayer identification number.

61. The connection between data breaches and identity theft is straightforward and well established. Cybercriminals steal personal information in order to monetize it, often by selling the stolen data on underground online marketplaces commonly referred to as the "dark web," where it is then used to commit identity theft and related fraud.

62. Stolen personal data is commonly trafficked on underground online marketplaces operating on the so-called "dark web," which are designed to obscure the identities of users and evade routine monitoring. These marketplaces provide cybercriminals with a means to anonymously buy, sell, and exploit compromised personal information, making detection difficult and increasing the risk that stolen PII/PHI will be repeatedly misused.

63. As a result of the Data Breach, Plaintiff's and the Class's unencrypted PII/PHI has been, or is reasonably likely to be, trafficked and misused in the manner typical of such incidents. Cybercriminals commonly sell or exchange stolen personal information through underground marketplaces, and once exposed, this information may be repeatedly accessed, disseminated, and exploited without authorization.

64. The compromise of Social Security numbers presents a particularly serious and lasting risk because such numbers cannot readily be changed. Victims are generally unable to obtain a new Social Security number unless they can demonstrate ongoing misuse, meaning relief is often unavailable until after harm has already occurred.

65. The theft of Social Security numbers, particularly when combined with other PII/PHI such as names, addresses, and dates of birth, provides cybercriminals with the information necessary to commit identity theft and fraud.

66. As cybersecurity expert Jim Stickley explained in *Time* magazine, the combination of a person's name and Social Security number makes identity theft easy absent protective measures such as a credit freeze. With that information, an identity thief can effectively assume another person's identity and commit fraud in their name. Mr. Stickley is a professional penetration tester who is retained by organizations to identify and remediate security vulnerabilities before they are exploited by criminals."[12]

67. There is often a significant delay between the theft of sensitive personal information, its misuse, and the victim's discovery of that misuse. Identity theft and fraud stemming from the Data Breach may remain undetected for months or even years, surfacing only when victims receive debt-collection notices, are informed by their employers or law enforcement of fraudulent unemployment claims, or discover that a fraudulent tax return has been filed when their legitimate return is rejected.

---

[12] Patrick L. Austin, *'It Is Absurd.' Data Breaches Show it's Time to Rethink How We Use Social Security Numbers, Experts Say*, TIME MAGAZINE (Aug. 5, 2019) https://time.com/5643643/capital-one-equifax-data-breach-social-security/.

68. Studies show that, on average, consumers do not discover identity theft for approximately three months after it occurs, and some victims take years—sometimes up to three years—to learn that their information has been stolen and misused.

69. Against this backdrop, Plaintiff and the Class must now live with the ongoing reality that their PII/PHI has been exposed and remains vulnerable to misuse by unknown third parties, including potential trafficking and exploitation for fraudulent purposes.

70. Identity theft becomes easier as cybercriminals obtain additional pieces of accurate personal information. The more data points an identity thief possesses, the easier it is to impersonate a victim, commit fraud, or target the victim for additional attacks to obtain even more information.

71. Even limited personal information—such as a name and date of birth—can be leveraged through social-engineering techniques to obtain additional sensitive data. Using information acquired in a data breach, cybercriminals often manipulate or deceive victims through phishing emails, text messages, or phone calls to extract login credentials, Social Security numbers, or other confidential information. Data breaches frequently serve as the starting point for these targeted follow-on attacks.

72. Stolen PII/PHI can be used to commit a wide range of identity-theft–related crimes. Identity thieves may obtain driver's licenses or other government identification in a victim's name, apply for government benefits, or file fraudulent tax returns using the victim's information. Stolen data may also be used to obtain employment, secure housing, or receive medical services in a victim's name, and in some instances has been provided to law enforcement during an arrest, resulting in warrants or records incorrectly issued in the victim's name.[13]

---

[13] *Identity Theft and Your Social Security Number,* SOCIAL SECURITY

73. One example of criminals piecing together bits and pieces of compromised PII/PHI to create comprehensive dossiers on individuals is called "Fullz" packages.[14] These dossiers are both shockingly accurate and comprehensive. With "Fullz" packages, cybercriminals can cross-reference two sources of PII/PHI to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy to assemble complete dossiers on individuals. For example, they can combine the stolen PII/PHI, and with unregulated data found elsewhere on the internet (like phone numbers, emails, addresses, etc.).

74. The development of "Fullz" packages means that the PII/PHI exposed in the Data Breach can easily be linked to data of Plaintiff and the Class that is available on the internet. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the PII/PHI stolen by the cyber-criminals in the Data Breach, criminals can easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over. That is exactly what is happening to Plaintiff and Class Members, and it is reasonable for any trier of fact, including this Court or a

ADMINISTRATION, 1 (2018), https://www.ssa.gov/pubs/EN-05-10064.pdf. (last visited July 9, 2025).

[14] "Fullz" is fraudster speak for data that includes the information of the victim, including, but not limited to, the name, address, credit card information, social security number, date of birth, and more. As a rule of thumb, the more information you have on a victim, the more money that can be made off those credentials. Fullz are usually pricier than standard credit card credentials, commanding up to $100 per record (or more) on the dark web. Fullz can be cashed out (turning credentials into money) in various ways, including performing bank transactions over the phone with the required authentication details in-hand. Even "dead Fullz," which are Fullz credentials associated with credit cards that are no longer valid, can still be used for numerous purposes, including tax refund scams, ordering credit cards on behalf of the victim, or opening a "mule account" (an account that will accept a fraudulent money transfer from a compromised account) without the victim's knowledge. *See, e.g.,* Brian Krebs, *Medical Records for Sale in Underground Stolen from Texas Life Insurance Firm,* KREBS ON SECURITY (Sep. 18, 2014), https://krebsonsecuritv.com/2014/09/ medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-firm.

jury, to find that Plaintiff and other Class Members' stolen PII/PHI is being misused, and that such misuse is fairly traceable to the Data Breach.

75. According to the FBI's 2019 Internet Crime Complaint Center (IC3) Internet Crime Report, internet-enabled crimes reached record levels that year, resulting in more than $3.5 billion in reported losses to individual and business victims.[15]

76. The same report emphasizes that "rapid reporting can help law enforcement stop fraudulent transactions before a victim loses the money for good." Defendant did the opposite. By failing to promptly notify Plaintiff and the Class that their PII/PHI had been compromised, Defendant deprived them of the earliest opportunity to take protective and mitigating measures. This delay exacerbated the harm caused by the Data Breach and increased the risk of fraud and financial loss.

77. Victims of identity theft also often suffer embarrassment, blackmail, or harassment in person or online, and/or experience financial losses resulting from fraudulently opened accounts or misuse of existing accounts.

78. In addition to out-of-pocket expenses that can exceed thousands of dollars and the emotional toll identity theft can take, some victims must spend a considerable time repairing the damage caused by the theft of their PII/PHI. Victims of new account identity theft will likely have to spend time correcting fraudulent information in their credit reports and continuously monitor their reports for future inaccuracies, close existing bank/credit accounts, open new ones, and dispute charges with creditors.

---

[15] *2019 Internet Crime Report* (Feb. 11, 2020) FED. BUREAU INTELLIGENCE, https://www.fbi.gov/news/stories/2019-internet-crime-report-released-021120 (last visited July 9, 2025).

79. Compounding the harm caused by the Data Breach, cybercriminals may wait years before using stolen PII/PHI. As a result, Plaintiff and the Class must remain vigilant and take protective measures for years—if not decades—into the future.

***Defendant Knew or Should Have Known of the Risk of a Data Breach***

80. Defendant's data security obligations were particularly important given the substantial increase in cyberattacks and/or data breaches in recent years.

81. In 2024, a record 3,158 data breaches occurred—exposing approximately 1,350,835,988 sensitive records (i.e., 211% increase year over year).[16]

82. Indeed, cyberattacks have become so notorious that the Federal Bureau of Investigation ("FBI") and U.S. Secret Service issue warnings to potential targets, so they are aware of, and prepared for, a potential attack. As one report explained, "[e]ntities like smaller municipalities and hospitals are attractive to ransomware criminals . . . because they often have lesser IT defenses and a high incentive to regain access to their data quickly."[17]

83. Accordingly, the rise in cyberattacks—and the attendant risk of future attacks—was widely known both to the public and within Defendant's industry, including Defendant itself.

***Defendant Could Have Prevented the Data Breach***.

84. Data breaches of the type at issue here are widely recognized as preventable. Industry guidance makes clear that organizations that collect and store sensitive personal information must implement reasonable security controls—through proper planning, system design, and enforcement of security policies—to prevent unauthorized access. Reported data

---

[16] *2024 Data Breach Report*, IDENTITY THEFT RESOURCE CENTER (Jan. 2025), https://www.idtheftcenter.org/wp-content/uploads/2025/02/ITRC_2024DataBreachReport.pdf.
[17] Ben Kochman, *FBI*, *Secret Service Warn of Targeted Ransomware*, LAW360 (Nov. 18, 2019), https://www.law360.com/articles/1220974/fbi-secret-service-warn-of-targeted-ransomware.

breaches most often result not from sophisticated attacks, but from inadequate safeguards and failures to implement and enforce basic security measures, including appropriate encryption and access controls.

***Defendant Failed to Adhere to FTC Guidelines***

85. According to the Federal Trade Commission ("FTC"), the need for data security should be factored into all business decision-making. Thus, the FTC issued numerous guidelines identifying best data security practices that businesses—like Defendant—should use to protect against unlawful data exposure.

86. In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*. There, the FTC set guidelines for what data security principles and practices businesses must use.[18] The FTC declared that, *inter alia*, businesses must:

a. protect the personal customer information that they keep;

b. properly dispose of personal information that is no longer needed;

c. encrypt information stored on computer networks;

d. understand their network's vulnerabilities; and

e. implement policies to correct security problems.

87. The guidelines also recommend that businesses watch for the transmission of large amounts of data out of the system—and then have a response plan ready for such a breach.

88. Furthermore, the FTC explains that companies must:

a. not maintain information longer than is needed to authorize a transaction;

b. limit access to sensitive data;

c. require complex passwords to be used on networks;

---

[18] *Protecting Personal Information: A Guide for Business,* FED TRADE COMMISSION (Oct. 2016) https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf.

d. use industry-tested methods for security;

e. monitor for suspicious activity on the network; and

f. verify that third-party service providers use reasonable security measures.

89. The FTC brings enforcement actions against businesses for failing to protect customer data adequately and reasonably. Thus, the FTC treats the failure—to use reasonable and appropriate measures to protect against unauthorized access to confidential consumer data—as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15. U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

***Defendant Failed to Follow Industry Standards***

90. Industry standards identify a core set of baseline cybersecurity practices that businesses like Defendant are expected to implement. At a minimum, these include employee training on data security, strong password policies, layered technical safeguards such as firewalls and anti-malware software, encryption of sensitive data, multi-factor authentication, regular data backups, and access controls limiting sensitive information to authorized personnel.

91. Additional industry-standard practices include deploying and maintaining malware-detection tools; monitoring and restricting network access points and ports; securing web browsers and email systems; properly configuring and maintaining network infrastructure such as firewalls, switches, and routers; safeguarding physical security systems; protecting communications systems; and providing ongoing training to staff on cybersecurity risks and response protocols.

92. Upon information and belief, Defendant failed to implement industry-standard cybersecurity measures, including failing to meet the minimum standards of both the NIST

Cybersecurity Framework Version 2.0 (including without limitation PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR-DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04) and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

93. These frameworks represent widely accepted industry standards. Defendant's failure to adhere to those standards left its systems vulnerable and allowed the Data Breach to occur.

***Defendant Failed to Comply with HIPAA-Related Data Security Obligations***

94. The Health Insurance Portability and Accountability Act ("HIPAA") establishes comprehensive security and privacy requirements intended to protect the confidentiality, integrity, and availability of medical information. Its implementing regulations—commonly referred to as the Administrative Simplification Rules—set national standards governing electronic transactions and require covered entities and business associates to maintain reasonable administrative, technical, and physical safeguards to protect protected health information.

95. HIPAA provides specific privacy rules that require comprehensive administrative, physical, and technical safeguards to ensure the confidentiality, integrity, and security of PII/PHI and PHI is properly maintained.[19]

96. The Data Breach resulted from Defendant's inadequate security practices and noncompliance with safeguards mandated by HIPAA. Among other things, Defendant did not

[19] *See* 45 C.F.R. § 164.306 (security standards and general rules); 45 C.F.R. § 164.308 (administrative safeguards); 45 C.F.R. § 164.310 (physical safeguards); 45 C.F.R. § 164.312 (technical safeguards).

implement, maintain, or enforce reasonable administrative, technical, and physical safeguards, including:

a. Did not ensure the confidentiality, integrity, and availability of electronic PHI it created, received, maintained, or transmitted, in violation of 45 C.F.R. § 164.306(a)(1);

b. Did not adequately protect against reasonably anticipated threats or hazards to the security or integrity of electronic PHI, in violation of 45 C.F.R. § 164.306(a)(2);

c. Did not adequately safeguard against reasonably anticipated uses or disclosures of electronic PHI not permitted by the Privacy Rule, in violation of 45 C.F.R. § 164.306(a)(3);

d. Did not ensure workforce compliance with HIPAA security standards, in violation of 45 C.F.R. § 164.306(a)(4);

e. Did not implement effective technical access controls for electronic information systems maintaining electronic PHI, in violation of 45 C.F.R. § 164.312(a)(1);

f. Did not adopt or enforce sufficient policies and procedures to prevent, detect, contain, and correct security violations, in violation of 45 C.F.R. § 164.308(a)(1);

g. Did not adequately identify, respond to, or mitigate known or reasonably suspected security incidents, in violation of 45 C.F.R. § 164.308(a)(6)(ii);

h. Did not provide adequate training to workforce members regarding PHI privacy and security obligations, in violation of 45 C.F.R. §§ 164.530(b) and 164.308(a)(5); and

i. Did not design, implement, or enforce reasonable physical and administrative safeguards to protect PHI, in violation of 45 C.F.R. § 164.530(c).

## CLASS ACTION ALLEGATIONS

97. Plaintiff brings this class action under Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3), individually and on behalf of all members of the following class:

> **All individuals residing in the United States whose PII/PHI was compromised in the data breach discovered by Monroe University, LTD. in December 2025, including those who received notice of the breach**.

98. Excluded from the Class are Defendant, its agents, affiliates, parents, subsidiaries, any entity in which Defendant has a controlling interest, any Defendant officer or director, any successor or assign, and any Judge who adjudicates this case, including their staff and immediate family.

99. Plaintiff reserves the right to amend the class definition.

100. Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of her claims on class-wide bases using the same evidence as would be used to prove those elements in individual actions asserting the same claims.

101. Ascertainability. All members of the proposed Class are readily ascertainable from information in Defendant's custody and control. After all, Defendant already identified some individuals and sent them data breach notices.

102. Numerosity. The Class Members are so numerous that joinder of all Class Members is impracticable. Upon information and belief, the proposed Class includes at least 100 members.

103. Typicality. Plaintiff's claims are typical of Class Members' claims as each arises from the same Data Breach, the same alleged violations by Defendant, and the same unreasonable manner of notifying individuals about the Data Breach.

104. Adequacy. Plaintiff will fairly and adequately protect the proposed Class's common interests. Her interests do not conflict with Class Members' interests. And Plaintiff has retained counsel—including lead counsel—that is experienced in complex class action litigation and data privacy to prosecute this action on the Class's behalf.

105. Commonality and Predominance. Plaintiff's and the Class's claims raise predominantly common fact and legal questions—which predominate over any questions affecting individual Class Members—for which a class wide proceeding can answer for all Class Members. In fact, a class wide proceeding is necessary to answer the following questions:

a. if Defendant had a duty to use reasonable care in safeguarding Plaintiff's and the Class's PII/PHI;

b. if Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

c. if Defendant were negligent in maintaining, protecting, and securing PII/PHI;

d. if Defendant breached contract promises to safeguard Plaintiff and the Class's PII/PHI;

e. if Defendant took reasonable measures to determine the extent of the Data Breach after discovering it;

f. if Defendant's Breach Notice was reasonable;

g. if the Data Breach caused Plaintiff and the Class injuries;

h. what the proper damages measure is; and

i. if Plaintiff and the Class are entitled to damages, treble damages, and or injunctive relief.

106. Superiority. A class action will provide substantial benefits and is superior to all other available means for the fair and efficient adjudication of this controversy. The damages or other financial detriment suffered by individual Class Members are relatively small compared to the burden and expense that individual litigation against Defendant would require. Thus, it would be practically impossible for Class Members, on an individual basis, to obtain effective redress for their injuries. Not only would individualized litigation increase the delay and expense to all parties and the courts, but individualized litigation would also create the danger of inconsistent or contradictory judgments arising from the same set of facts. By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, ensures economies of scale, provides comprehensive supervision by a single court, and presents no unusual management difficulties.

**COUNT I**
**NEGLIGENCE**
**(On Behalf of Plaintiff and the Class)**

107. Plaintiff realleges and incorporates by reference each and every allegation contained above as though fully set forth herein.

108. Plaintiff and the Class entrusted their PII/PHI to Defendant on the premise and with the understanding that Defendant would safeguard their PII/PHI, use their PII/PHI for business purposes only, and/or not disclose their PII/PHI to unauthorized third parties.

109. Defendant owed a duty of care to Plaintiff and Class Members because it was foreseeable that Defendant's failure—to use adequate data security in accordance with industry standards for data security—would compromise their PII/PHI in a data breach. And here, that foreseeable danger came to pass.

110. Defendant has full knowledge of the sensitivity of the PII/PHI and the types of harm that Plaintiff and the Class could and would suffer if their PII/PHI was wrongfully disclosed.

111. Defendant owed these duties to Plaintiff and Class Members because they are members of a well-defined, foreseeable, and probable class of individuals whom Defendant knew or should have known would suffer injury-in-fact from Defendant's inadequate security practices. After all, Defendant actively sought and obtained Plaintiff and Class Members' PII/PHI.

112. Defendant owed—to Plaintiff and Class Members—at least the following duties to:

a. exercise reasonable care in handling and using the PII/PHI in its care and custody;

b. implement industry-standard security procedures sufficient to reasonably protect the information from a data breach, theft, and unauthorized;

c. promptly detect attempts at unauthorized access;

d. notify Plaintiff and Class Members within a reasonable timeframe of any breach to the security of their PII/PHI.

113. Thus, Defendant owed a duty to timely and accurately disclose to Plaintiff and Class Members the scope, nature, and occurrence of the Data Breach. After all, this duty is required

and necessary for Plaintiff and Class Members to take appropriate measures to protect their PII/PHI, to be vigilant in the face of an increased risk of harm, and to take other necessary steps to mitigate the harm caused by the Data Breach.

114. Defendant also had a duty to exercise appropriate clearinghouse practices to remove PII/PHI it was no longer required to retain under applicable regulations.

115. Defendant knew or reasonably should have known that the failure to exercise due care in the collecting, storing, and using of the PII/PHI of Plaintiff and the Class involved an unreasonable risk of harm to Plaintiff and the Class, even if the harm occurred through the criminal acts of a third party.

116. Defendant's duty to use reasonable security measures arose because of the special relationship that existed between Defendant and Plaintiff and the Class. That special relationship arose because Plaintiff and the Class entrusted Defendant with their confidential PII/PHI, a necessary part of obtaining services from Defendant.

117. Under the FTC Act, 15 U.S.C. § 45, Defendant had a duty to use fair and adequate computer systems and data security practices to safeguard Plaintiff and Class Members' PII/PHI.

118. Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to use reasonable measures to protect the PII/PHI entrusted to it. The FTC publications and orders promulgated pursuant to the FTC Act also form part of the basis of Defendant's duty to protect Plaintiff and the Class Members' sensitive PII/PHI.

119. Defendant violated its duty under Section 5 of the FTC Act by failing to use reasonable measures to protect PII/PHI and not complying with applicable industry standards as

described in detail herein. Defendant's conduct was particularly unreasonable given the nature and amount of PII/PHI Defendant had collected and stored and the foreseeable consequences of a data breach, including, specifically, the immense damages that would result to individuals in the event of a breach, which ultimately came to pass.

120. Similarly, under HIPAA, Defendant had a duty to follow HIPAA standards for privacy and security practices—as to protect Plaintiff's and Class Members' PHI.

121. Defendant violated its duty under HIPAA by failing to use reasonable measures to protect its PHI and by not complying with applicable regulations detailed *supra*. Here too, Defendant's conduct was particularly unreasonable given the nature and amount of PHI that Defendant collected and stored and the foreseeable consequences of a data breach, including, specifically, the immense damages that would result to individuals in the event of a breach, which ultimately came to pass.

122. The risk that unauthorized persons would attempt to gain access to the PII/PHI and misuse it was foreseeable. Given that Defendant hold vast amounts of PII/PHI, it was inevitable that unauthorized individuals would attempt to access Defendant's databases containing the PII/PHI —whether by malware or otherwise.

123. PII/PHI is highly valuable, and Defendant knew, or should have known, the risk in obtaining, using, handling, emailing, and storing the PII/PHI of Plaintiff and Class Members' and the importance of exercising reasonable care in handling it.

124. Defendant improperly and inadequately safeguarded the PII/PHI of Plaintiff and the Class in deviation of standard industry rules, regulations, and practices at the time of the Data Breach.

125. Defendant breached these duties as evidenced by the Data Breach.

126. Defendant acted with wanton and reckless disregard for the security and confidentiality of Plaintiff's and Class Members' PII/PHI by:

a. disclosing and providing access to this information to third parties and

b. failing to properly supervise both the way the PII/PHI was stored, used, and exchanged, and those in its employ who were responsible for making that happen.

127. Defendant breached its duties by failing to exercise reasonable care in supervising its agents, contractors, vendors, and suppliers, and in handling and securing the personal information and PII/PHI of Plaintiff and Class Members which actually and proximately caused the Data Breach and Plaintiff and Class Members' injury.

128. Defendant further breached its duties by failing to provide reasonably timely notice of the Data Breach to Plaintiff and Class Members, which actually and proximately caused and exacerbated the harm from the Data Breach and Plaintiff and Class Members' injuries-in-fact.

129. Defendant has admitted that the PII/PHI of Plaintiff and the Class was wrongfully lost and disclosed to unauthorized third persons because of the Data Breach.

130. As a direct and traceable result of Defendant's negligence and/or negligent supervision, Plaintiff and Class Members have suffered or will suffer damages, including monetary damages, increased risk of future harm, embarrassment, humiliation, frustration, and emotional distress.

131. And, on information and belief, Plaintiff's PII/PHI has already been published—or will be published imminently—by cybercriminals on the Dark Web.

132. Defendant's breach of its common-law duties to exercise reasonable care and its failures and negligence actually and proximately caused Plaintiff and Class Members actual,

tangible, injury-in-fact and damages, including, without limitation, the theft of their PII/PHI by criminals, improper disclosure of their PII/PHI, lost benefit of their bargain, lost value of their PII/PHI, and lost time and money incurred to mitigate and remediate the effects of the Data Breach that resulted from and were caused by Defendant's negligence, which injury-in-fact and damages are ongoing, imminent, immediate, and which they continue to face.

## COUNT II
## BREACH OF IMPLIED CONTRACT
## (On Behalf of Plaintiff and the Class)

133. Plaintiff realleges and incorporates by reference each and every allegation contained above as though fully set forth herein.

134. Plaintiff and Class Members were required to provide their PII/PHI to Defendant as a condition of enrollment as a student or receiving employment provided by Defendant. Plaintiff and Class Members provided their PII/PHI to Defendant or its third-party agents in exchange for Defendant's services or employment.

135. Plaintiff and Class Members reasonably understood that a portion of the funds they either paid to Defendant or derived from their labor would be used to pay for adequate cybersecurity measures.

136. Plaintiff and Class Members reasonably understood that Defendant would use adequate cybersecurity measures to protect the PII/PHI that they were required to provide based on Defendant's duties under state and federal law and its internal policies.

137. Plaintiff and the Class Members accepted Defendant's offers by disclosing their PII/PHI to Defendant or its third-party agents in exchange for services or employment.

138. In turn, and through internal policies, Defendant agreed to protect and not disclose the PII/PHI to unauthorized persons.

139. In its Privacy Policy, Defendant represented that they had a legal duty to protect Plaintiff's and Class Member's PII/PHI.

140. Implicit in the parties' agreement was that Defendant would provide Plaintiff and Class Members with prompt and adequate notice of all unauthorized access and/or theft of their PII/PHI.

141. After all, Plaintiff and Class Members would not have entrusted their PII/PHI to Defendant in the absence of such an agreement with Defendant.

142. Plaintiff and the Class fully performed their obligations under the implied contracts with Defendant.

143. The covenant of good faith and fair dealing is an element of every contract. Thus, parties must act with honesty in fact in the conduct or transactions concerned. Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—and not merely the letter—of the bargain. In short, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form.

144. Subterfuge and evasion violate the duty of good faith in performance even when an actor believes their conduct to be justified. Bad faith may be overt or consist of inaction. And fair dealing may require more than honesty.

145. Defendant materially breached the contracts it entered with Plaintiff and Class Members by:

a. failing to safeguard their information;

b. failing to notify them promptly of the intrusion into its computer systems that compromised such information.

c. failing to comply with industry standards;

d. failing to comply with the legal obligations necessarily incorporated into the agreements; and

e. failing to ensure the confidentiality and integrity of the electronic PII/PHI that Defendant created, received, maintained, and transmitted.

146. In these and other ways, Defendant violated its duty of good faith and fair dealing.

147. Defendant's material breaches were the direct and proximate cause of Plaintiff's and Class Members' injuries (as detailed *supra*).

148. And, on information and belief, Plaintiff's PII/PHI has already been published—or will be published imminently—by cybercriminals on the Dark Web.

149. Plaintiff and Class Members performed as required under the relevant agreements, or such performance was waived by Defendant's conduct.

**COUNT III**
**UNJUST ENRICHMENT**
**(On Behalf of Plaintiff and the Class)**

150. Plaintiff realleges and incorporates by reference each and every allegation contained above as though fully set forth herein.

151. This claim is pleaded in the alternative to the breach of implied contract claim.

152. Plaintiff and Class Members conferred a benefit upon Defendant. After all, Defendant benefitted from (1) using their PII/PHI to provide services or facilitate employment, and (2) accepting payment or using their labor to derive profit.

153. Defendant appreciated or had knowledge of the benefits it received from Plaintiff and Class Members.

154. Plaintiff and Class Members reasonably understood that Defendant would use adequate cybersecurity measures to protect the PII/PHI that they were required to provide based on Defendant's duties under state and federal law and its internal policies.

155. Defendant enriched itself by saving the costs they reasonably should have expended on data security measures to secure Plaintiff's and Class Members' PII/PHI.

156. Instead of providing a reasonable level of security, or retention policies, that would have prevented the Data Breach, Defendant instead calculated to avoid its data security obligations

at the expense of Plaintiff and Class Members by utilizing cheaper, ineffective security measures. Plaintiff and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's failure to provide the requisite security.

157. Under principles of equity and good conscience, Defendant should not be permitted to retain the full value of Plaintiff's and Class Members' (1) PII/PHI and (2) employment or payment because Defendant failed to adequately protect their PII/PHI.

158. Plaintiff and Class Members have no adequate remedy at law.

159. Defendant should be compelled to disgorge into a common fund—for the benefit of Plaintiff and Class Members—all unlawful or inequitable proceeds that it received because of its misconduct.

**COUNT IV**
**VIOLATION OF NEW YORK DECEPTIVE TRADE PRACTICES ACT ("GBL")**
**New York Gen. Bus. Law § 349**
**(On Behalf of Plaintiff and the Class)**

160. Plaintiff realleges and incorporates by reference each and every allegation contained above as though fully set forth herein.

161. Under the New York Gen. Bus. Law § 349, "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful."

162. Notably, Defendant's deceptive acts and/or practices were directed at consumers. After all, via its policies, Defendant represented to consumers that they would, inter alia, use reasonably adequate data security.

163. And these deceptive acts—including the quotations provided supra—were materially misleading insofar as they induced consumers to rely on such statements and disclose their PII.

164. Section § 349 applies to Defendant because there is a sufficient nexus between Defendant's conduct and New York. After all, Defendant is organized in New York and its corporate headquarters are in Bronx, New York.

165. And, upon information and belief, the misleading acts and/or practices alleged herein—including the manifestations in Defendant's data security policies—were written, approved, and/or otherwise authorized by Defendant within the state of New York.

166. Defendant violated Section § 349 by:

a. failing to implement and maintain reasonable security and privacy measures to protect Plaintiff's and Class Members' PII/PHI, which was a direct and proximate cause of the Data Breach;

b. failing to identify foreseeable security and privacy risks, remediate identified security and privacy risks, and adequately improve security and privacy measures following previous cybersecurity incidents, which was a direct and proximate cause of the Data Breach;

c. failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and Class Members' PII/PHI, including duties imposed by the FTC Act, 15 U.S.C. § 45, the FCRA, 15 U.S.C. § 1681e, and the GLBA, 15 U.S.C. § 6801, et seq., which was a direct and proximate cause of the Data Breach;

d. omitting, suppressing, and concealing the material fact that it did not reasonably or adequately secure Plaintiff's and Class Members' PII/PHI; and

e. omitting, suppressing, and concealing the material fact that it did not comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and Class Members' PII/PHI, including duties imposed by the FTC Act, 15 U.S.C. § 45, the FCRA, 15 U.S.C. § 1681e, and the GLBA, 15 U.S.C. § 6801, *et seq*.

167. Defendant's omissions were material because they were likely to deceive reasonable consumers about the adequacy of Defendant's data security and ability to protect the confidentiality of their PII/PHI.

168. Defendant intended to mislead Plaintiff and Class Members and induce them to rely on its omissions.

169. Had Defendant disclosed to Plaintiff and Class Members that its data systems were not secure—and thus vulnerable to attack—Defendant would have been unable to continue in business and it would have been forced to adopt reasonable data security measures and comply with the law. Defendant accepted the PII/PHI that Plaintiff and Class Members entrusted to it while keeping the inadequate state of its security controls secret from the public. Accordingly, Plaintiff

and Class Members acted reasonably in relying on Defendant's omissions, the truth of which they could not have discovered through reasonable investigation.

170. Defendant acted intentionally, knowingly, maliciously, and recklessly disregarded Plaintiff's and Class Members' rights. As a direct and proximate result of Defendant's unfair and deceptive acts and practices, Plaintiff and Class Members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from fraud and identity theft; time and expenses related to monitoring their financial accounts for fraudulent activity; an increased, imminent risk of fraud and identity theft; and loss of value of their PII/PHI.

171. And, on information and belief, Plaintiff's PII has already been published—or will be published imminently—by cybercriminals on the Dark Web.

172. Plaintiff and Class Members seek all monetary and non-monetary relief allowed by law.

**COUNT V**
**DECLARATORY JUDGMENT**
**(On Behalf of Plaintiff and the Class)**

173. Plaintiff incorporates by reference all other paragraphs as if fully set forth herein.

174. Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq*., this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and to grant further necessary relief. The Court has broad authority to restrain acts, such as those alleged herein, which are tortious and unlawful.

175. In the fallout of the Data Breach, an actual controversy has arisen about Defendant's various duties to use reasonable data security. On information and belief, Plaintiff

alleges that Defendant's actions were—and *still* are—inadequate and unreasonable. And Plaintiff and Class Members continue to suffer injury from the ongoing threat of fraud and identity theft.

176. Given its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

a. Defendant owed—and continues to owe—a legal duty to use reasonable data security to secure the data entrusted to it;

b. Defendant has a duty to notify impacted individuals of the Data Breach under the common law and Section 5 of the FTC Act;

c. Defendant breached, and continues to breach, its duties by failing to use reasonable measures to the data entrusted to it; and

d. Defendant breaches of its duties caused—and continues to cause—injuries to Plaintiff and Class Members.

177. The Court should also issue corresponding injunctive relief requiring Defendant to use adequate security consistent with industry standards to protect the data entrusted to it.

178. If an injunction is not issued, Plaintiff and the Class will suffer irreparable injury and lack an adequate legal remedy if Defendant experiences a second data breach.

179. And if a second breach occurs, Plaintiff and the Class will lack an adequate remedy at law because many of the resulting injuries are not readily quantified in full and they will be forced to bring multiple lawsuits to rectify the same conduct. Simply put, monetary damages—while warranted for out-of-pocket damages and other legally quantifiable and provable damages—cannot cover the full extent of Plaintiff and Class Members' injuries.

180. If an injunction is not issued, the resulting hardship to Plaintiff and Class Members far exceeds the minimal hardship that Defendant could experience if an injunction is issued.

181. An injunction would benefit the public by preventing another data breach—thus preventing further injuries to Plaintiff, Class Members, and the public at large.

**PRAYER FOR RELIEF**

Plaintiff and Class Members respectfully request judgment against Defendant and that the Court enter an order:

A. Certifying this case as a class action on behalf of Plaintiff and the proposed Class, appointing Plaintiff as class representative, and appointing her counsel to represent the Class;

B. Awarding declaratory and other equitable relief as necessary to protect the interests of Plaintiff and the Class;

C. Awarding injunctive relief as necessary to protect the interests of Plaintiff and the Class;

D. Awarding Plaintiff and the Class damages including applicable compensatory, exemplary, punitive damages, and statutory damages, as allowed by law;

E. Awarding restitution and damages to Plaintiff and the Class in an amount to be determined at trial;

F. Awarding attorneys' fees and costs, as allowed by law;

G. Awarding prejudgment and post-judgment interest, as provided by law;

H. Granting Plaintiff and the Class leave to amend this complaint to conform to the evidence produced at trial; and

I. Granting other relief that this Court finds appropriate.

**DEMAND FOR JURY TRIAL**

Plaintiff demands a jury trial for all claims so triable.

Date: January 21, 2026

Respectfully submitted,

/s/ Katherine M. Aizpuru
Katherine M. Aizpuru (Bar No. 5305990)
**TYCKO & ZAVAREEI LLP**
2000 Pennsylvania Ave. NW, Suite 1010
Washington, D.C. 20006
Tel. 202-973-0900
Fax: 202-973-0950
*kaizpuru@tzlegal.com*

Sabita J. Soneji*
**TYCKO & ZAVAREEI LLP**
1970 Broadway, Suite 1070
Oakland, California 94612
Telephone: (510) 254-6808
*ssoneji@tzlegal.com*

**Pro hac vice forthcoming*
*Attorneys for Plaintiff and Proposed Class*